IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

JESSY NAPPER,

     Petitioner,

v.                                                                    No. 1:16-cv-01023-JDB-jay

UNITED STATES OF AMERICA,

     Respondent.


ORDER DENYING CLAIM,
DENYING § 2255 PETITION,
DENYING CERTIFICATE OF APPEALABILITY,
AND
DENYING LEAVE TO APPEAL IN FORMA PAUPERIS

On August 13, 2021, the Court held an evidentiary hearing on the sole remaining claim in this case (the "Evidentiary Hearing").  (Docket Entry ("D.E.") 64, 67.)[1]  For the following reasons, the claim is DENIED.

BACKGROUND

In 2009, a federal grand jury sitting in the Western District of Tennessee returned a seventeen-count indictment, and later a superseding indictment, charging Napper[2] and others with federal drug crimes (the "Memphis case").  (*United States v. Napper*, No. 2:09-cr-20123-SHM-cgc-5 (W.D. Tenn.), D.E. 2, 92.)  As to Napper specifically, he was charged with conspiracy to possess with intent to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. § 846, and distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1).  (*Id.*, D.E. 92 at PageID 208, 219.)

---

[1]  Record citations are to documents filed in the present matter, unless otherwise noted.
[2]  The Court will refer to Napper as "the Defendant" in its discussion of his criminal cases.

Napper and the Government entered into a plea agreement whereby the Defendant would plead guilty to the distribution count and the Government would recommend a three-year term of incarceration.  On April 10, 2012, the Defendant pleaded guilty before the Honorable Samuel H. Mays.  In anticipation of sentencing, the United States Probation Office prepared a presentence report ("2009 PSR").  (Exhibit 5.)[3]  The 2009 PSR advised that Napper qualified as a career offender subject to an enhanced advisory range of incarceration pursuant to the  United States Sentencing Commission *Guidelines Manual* (the "Guidelines" or "U.S.S.G."), § 4B1.1.

Defense counsel filed a position paper responding to the 2009 PSR.  (No. 2:09-cr-20123-SHM-cgc, D.E. 602.)   In that document, he represented that "Mr. Napper recognizes and acknowledges that he qualifies as a Career Offender under U.S.S.G. § 4B1.1(a)." (*Id.*, D.E. 602 at PageID 1290.)  Counsel argued, however, that, "because of the large disparity between Mr. Napper's Guidelines range when calculated as a Career Offender . . . and his guidelines range when not calculated as a career offender," he should receive a sentence well below the advisory Guidelines range.  (*Id.*, D.E. 602 at PageID 1290.)

At the sentencing hearing held on August 22, 2012, Judge Mays asked the Defendant "[H]ave you reviewed the presentence investigation report in your case?"  (Ex. 4 at 3.)  Napper responded "Yes, sir." (*Id.*)  The judge discussed with the attorneys at length the Defendant's status as a career offender.  Counsel confirmed for the judge that he did not "object to the guideline calculations of the presentence report[.]"  (*Id.* at 10.)  He argued, however, that the agreed-to sentence of three years' incarceration was warranted in light of the sentencing considerations under 18 U.S.C. § 3553(a).

---

[3]   Record citations to exhibits are to documents admitted into evidence at the Evidentiary Hearing.  Citations to Exhibit 5 are to the page numbers that appear on the original transcript.

Judge Mays "accept[ed] the presentence report as findings of fact without objection," and "adopt[ed] the guideline calculations of the presentence report as the conclusions of law without objection." (*Id.*)  He determined that the Defendant qualified as a career offender, with a resulting advisory range of 151 to 188 months' incarceration.  (*Id.* at 12 ("We're in the 2011 guideline manual, 151 to 188 months.  Six—lets' see.  It's talking about the career offender—151-188 months."); *see also id.* at 20 (career offender provision "does apply"), 26 ("Mr. Napper has a significant criminal history.  He's a Criminal History Category 6 because he quite appropriately qualifies as a career offender"), 28 ("For purposes of the earned [criminal history] points, obviously[] it's within six appropriately because of his career offender category"), 31 ("Let me simply say there's absolutely no objection to Mr. Napper being characterized as a career offender. He is one."), 33 ("So I think the guideline application here is perfectly appropriate and the parties don't actually dispute it.").)  The judge determined, however, after consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a), that a variance below the applicable Guidelines range was warranted:

> THE COURT: Now having said that, of course, the guidelines are advisory.  As I've said at the outset, that's what  Booker counsels and that's what Booker's progeny counsels. Certainly, if you look at Rita, particularly if you look  at Kimbrough, you recognize the Courts can vary or -- well, I'll say vary. I won't say depart in this circumstance. But can vary from the guidelines based on policy considerations and disagreements with the guidelines. I don't have any policy problem with this and I don't disagree with it. So I think the guideline application here is  perfectly appropriate and the parties don't actually dispute it. So the question is how does one sentence under this guideline range? And the answer is just like any  other guideline range. It's a career offender but you treat it in the way that you would treat the guideline range absent career offender. It's advisory.  You go through a 3553 analysis, as I said at the outset, whether it's career offender or not.
>
> And when you do it -- if you do that, then you recognize that in this case -- not in all cases, but perhaps not in most cases, certainly not most cases in my experience -- career offender just doesn't work. It creates here a range for an offense in which Mr. Napper is not as culpable as the people who were engaged in the

Count 1 offense. It creates a very high guideline range for a couple of street level sales of crack cocaine. It deals -- it increases the guidelines for criminal history purposes up to six, Criminal History Category 6, which is out of proportion to the actual criminal history. And -- criminal history -- the criminal history is disturbing because it's consistent and it's consistent with this crime. So it needs to be a significant sentence.

But the criminal history is -- it's not a criminal history that ordinarily would drive you to guideline range. It's appropriate to have career offender, but when you get behind the numbers, which you have to do to sentence appropriately, you find that it's more street level stuff. Ultimately, I think this is not what Congress or the commission intended in terms of a -- for a serious drug offense.

So you have a -- obviously, the guidelines here do take account the acceptance of responsibility, which I've finally gotten out of Mr. Napper. Not because Mr. Napper -- after I heard him -- was any -- any way deficient in accepting his acceptance or accepting his guilt and responsibility, but his lawyer advised him he shouldn't do it.  But he said and as I quoted -- or close to it -- I'm done and I accept it. And he said it very eloquently. So if -- but the guidelines picked that up already.

The problem is they're driving up a sentence. Career offender drives up a sentence. I don't want to say career offender. I want to say the guidelines as calculated drive the sentence far up what I think a just sentence could be and must be in this case. And I think everyone agrees. I think the probation officer agrees.

THE PROBATION OFFICER:· Yes, Your Honor.

THE COURT:· See. The guidelines are calculated correctly but the sentence is too high.

I'm not giving great weight to the family situation here. I understand that Mr. Napper has a seven year-old daughter who has lost her mother. But that situation is not something I give great weight to.  Most people have families and they make terrible choices and their families suffer. That's what we have here.  Mr. Napper's made a whole lifetime of terrible choices to use the drugs he's used, to commit the crimes he's committed and then to commit this crime.

So I don't -- under the old guidelines, I couldn't give any weight to that. I say old guidelines. Pre Booker I couldn't give any weight to that because it was a departure. I gave almost no weight to it here. 1 can give weight to it, but I don't think it's a driving force here. Driving force here is the nature of the offense. The nature of the criminal history suggests a sentence much lower than the guidelines. Not based on any policy agreement I have, I want to emphasize again.

I think the parties have reached an appropriate agreement about the matter, both counsel with respective experience. You've seen many cases. You had the

4

opportunity to evaluate this case on its merits. Mr. McWhirter has had the opportunity to work extensively with Mr. Napper and become very familiar with Mr. Napper's case.  Mr. Whitmore came to the case later but -- didn't indict the case -- but was preparing for trial as having experience with all the defendants in this case, and he was aware of Mr. Napper's relative culpability.

Both parties have agreed that 36 months is the appropriate sentence.  I agree. I'm going to adopt the plea agreement. But the sentencing process, I'm going to sentence in accordance with the plea agreement to 36 months of custody for the reasons I've stated.· I -- well, for the reasons I have stated.

(*Id.* at 33-36.)

In closing, the judge had the following exchange with the Defendant:

COURT: Now, Mr. Napper, get it together.  You've got an opportunity here that you wouldn't have in most situations.  Ordinarily I -- first, I respect the guidelines a lot.  Not everybody does, but I do.  Your guideline range is up to 188 months in prison.  Your statute range is up to 20 years in prison.  You're getting a three-year prison sentence.  I consider that a very serious sentence.  If you have to serve it, I'm sure you consider it a very serious sentence.  But it's a lot less than you could have gotten in this case.

THE DEFENDANT: Yes, sir."

(*Id.* at 39.)

In November and December of 2011, while he was out on bond in the Memphis case, Napper committed additional federal drug offenses which resulted in the filing, on January 22, 2013, of another federal indictment (the "Jackson case").  (*United States v. Napper*, No. 13-cr-10008-JDB-1, D.E. 2 at PageID 6-8; *id.*, D.E. 156 at PageID 408.)  He was charged with one count of conspiracy to distribute and possess with intent to distribute cocaine and cocaine base (Count 1), in violation of 21 U.S.C. §§ 841(a)(1), 846, and two counts of "aiding and abetting . . . [the] possess[ion] with the intent to distribute, distribute, and attempt to distribute" cocaine base (Count 2) and cocaine (Count 3), in violation of 21 U.S.C. §§ 812, 841(a)(1), and 18 U.S.C. § 2.  (*Id.*, D.E. 2 at PageID 6-10.)  On July 29, 2013, Attorney Randolph Alden was appointed to represent him.

5

The Government offered a plea deal of 72 months' incarceration, which Petitioner turned down. On November 7, 2013, Napper entered an open plea of guilty to all three counts of the indictment.

The presentence report ("2013 PSR") advised that the Defendant was subject to an enhanced sentence as a career offender. (2013 PSR at ¶¶ 21.) "Based upon a total offense level of 29 and a criminal history category of VI, the guideline imprisonment range" was calculated to be 151-188 months. (*Id.* at ¶ 81 (bolding omitted).) At sentencing, the undersigned asked Napper if he "had the opportunity to receive and review a copy of the presentence report and discuss that with [his] attorney." (No. 13-cr-10008-JDB-3, D.E. 156 at PageID 427.) Petitioner replied, "Yes, sir." (*Id.*, D.E. 156 at PageID 427.) The undersigned determined that the Defendant was a career offender, considered the § 3553 factors, and granted a downward variance to 135 months to reflect the time Napper had already served in the Memphis case. A three-year period of supervised release was also imposed.

The Defendant appealed, arguing that his sentence was substantively unreasonable in light of, among other things, the Government's delay in indicting him. The Sixth Circuit rejected the argument and affirmed the sentence.

Petitioner filed a verified 28 U.S.C. § 2255 petition relating to the Jackson case (D.E. 1), as well as a supplement to the petition (D.E. 10) (collectively "the Amended Petition"). He maintained that he no longer qualified as a career offender and that the Government intentionally delayed filing the indictment in order to enhance the sentence under the career offender provision. He also asserted that counsel rendered ineffective assistance by failing to advise him about his career offender status at the time the Government offered a 72-month plea deal, challenge his career offender status, review the PSR with him, argue at sentencing that he was a single parent, and object to the drug quantities reported in the 2013 PSR. With regard to counsel's alleged failure

to advise Petitioner of his career offender status and its consequences, Napper averred that he "would have accepted the Government's plea offer and tendered a plea of guilty" had counsel properly advised him. (D.E. 1 at PageID 4.)   The Court denied all of the claims and declined to issue a certificate of appealability ("COA").   (D.E. 17.)

On appeal, the Sixth Circuit granted a COA on the plea-offer claim and denied a COA on each of the remaining claims.   (D.E. 22.)   On full briefing of the plea-offer claim, Petitioner contended that the district court should have conducted an evidentiary hearing on the issue of whether counsel advised him that he was subject to sentencing as a career offender.   In response, the Government argued "that counsel *did* advise Napper that he qualified for sentencing as a career offender, as evidenced by counsel's affidavit and an October 25, 2013, letter to Napper that reflected that he and Napper had discussed the career-offender issue 'a number of times' and that he advised Napper to accept the government's plea offer because the government had agreed to a sentence 'WELL BELOW the advisory guidelines.'"   (D.E. 24 at PageID 110 (emphasis in original)).   "The government also argue[d] that, even if counsel performed deficiently, Napper [could not] establish prejudice . . . because [he] already knew that he qualified as a career offender."   (*Id.* at PageID 111.)   Specifically, "Napper's presentence report in the 2009 case designated him as a career offender and . . . Napper, through counsel, acknowledged that he qualified as such."   (*Id.*)   This "knowledge," the Government argued, "mean[t] the district court was within its discretion to find Napper's allegations of ignorance inherently incredible or contradicted by the record."   (*Id.*)

Addressing *Strickland*'s deficient-performance prong, the Sixth Circuit held that a factual dispute regarding the content of counsel's advice during plea negotiations was created by Petitioner's allegation in his verified Amended Petition that counsel did not advise him of the

consequences of rejecting the plea offer and counsel's contrary averment in his affidavit.  (*Id.* at 110-11.)   The court further found that counsel's October 25, 2013, after-the-fact letter summarizing the attorney-client discussions, did not resolve the dispute.  (*Id.*)

Regarding the prejudice prong, the Sixth Circuit held that, although the presentence report in the 2009 case designated Petitioner as a career offender and his attorney affirmed as much to the court in his position paper, those facts, "on [their] own, neither foreclose[] the possibility that Napper was prejudiced nor prove[] Napper's allegations are unbelievable."  (*Id.* at PageID 111.) The court reasoned that

> Napper may not have known about the consequences of being deemed a career offender because he did not receive a career-offender sentence in the 2009 case. Instead, the district court imposed the much lower 36-month sentence that the parties specified in their plea agreement (which made no mention of the career-offender guideline).  It is thus not beyond belief that Napper was unaware of the severe sentencing consequences that could flow from his career-offender status.

(*Id.*).   The court concluded that, "while Napper's claim may ultimately prove false at the evidentiary hearing, he has alleged enough to require the district court to hold one."  (*Id.* (citations and internal quotation marks omitted).)   The Sixth Circuit therefore vacated the judgment "with respect to the denial of Napper's claim that counsel was ineffective during plea negotiations," and remanded the case for an evidentiary hearing.  (*Id.*)

EVIDENTIARY HEARING

On remand, Petitioner filed, through appointed counsel, a supplemental brief in support of the sole remaining claim (the "Supplemental Brief").  (D.E. 42.)  He reiterated that, "had counsel adequately advised him that he could be sentenced as a career offender he would have accepted an alleged plea offer that would have capped his sentence at six years."  (*Id.* at PageID 181; *see also id.* at PageID 183 ("[C]ounsel's failure to inform him of his sentencing exposure was the proximate

8

cause of his high sentence.").)  He also argued that "the disparity in the Petitioner's sentence alone establishes prima facie evidence of his lack of personal knowledge concerning his potential sentencing exposure." (*Id.* at PageID 182.)  The Government did not file a supplemental brief in response.[4]

At the Evidentiary Hearing, counsel testified that he was an Assistant Federal Public Defender in the Western District of Tennessee, Eastern Division, from 2002 until 2017.  (D.E. 67 at PageID 232.)  He stated that he represented "hundreds" of criminal defendants during that time, including Petitioner.  (*Id.*)

Counsel recalled that Petitioner was "determined to be a career offender in [the Memphis] case," and "again in [the Jackson] case." (*Id.* at PageID 234.)  He explained that he "was able to negotiate the [72-month] offer . . . to resolve the case," but that his client "rejected" it. (*Id.*)  After "prepar[ations] for trial" were underway, Petitioner "decided to enter a guilty plea." (*Id.*)  Alden testified that he sent Napper a letter, admitted as Exhibit 2.  (*Id.* at PageID 241.) The document, which was dated one month before sentencing, was a "cover letter that [he] sent with the PSR," (*id.*) telling Petitioner that he would "be out to see [him] as soon as possible to go over the report with" him (Ex. 2).  Alden testified that he did, in fact, go "over the PSR with" Petitioner prior to sentencing.  (D.E. 67 at PageID 234-35.)

Counsel was shown Exhibit 3, which was his letter to Napper dated October 25, 2013.  (*Id.* at PageID 235.)  Alden stated that "[t]he general purpose of this letter . . . was to explain to [Petitioner] exactly what he was facing, remind him what [they] had discussed on numerous occasions, remind him of the offer that he rejected, then to address some of the contentions that he

---

[4]  The Government filed a motion requesting a ruling that Petitioner waived the attorney-client privilege with regard to his communications with counsel from his Memphis case.  (D.E. 56.)  The Court denied the motion.  (D.E. 63.)

had made regarding whether the government would still proceed to trial[.]"   (*Id.* at PageID 235-36.)

When asked whether he "discuss[ed] the career offender status with Mr. Napper at length," he replied, "Yes, numerous times," including "in person."   (*Id.* at PageID 236.)   Counsel stated that he did so "when I might have seen him at Mason."[5]   (*Id.* at PageID 240.)   Regarding the Memphis case, counsel "specifically remember[ed] mentioning to [Napper] that he was a career offender in the other case, which made him, again, a career offender in this case."   (*Id.* at PageID 238.)   He stated, "It wasn't a surprise to [Petitioner], in my estimation, the way I observed it, because he had already been declared a career offender once. . . . He never expressed any—he debated a lot of things with me, but he never took issue with that, that I recall."   (*Id.*)

Counsel further testified that Petitioner was heard "on [a] jail tape discussing going to trial in [the Jackson] case."   (*Id.* at 239.)   He recalled that Napper "made the statement that . . . it will cost [the Government] $100,000 to try the case, and they don't' want to spend the money."   (*Id.*)   Counsel could not remember if Petitioner made the statement "before or after he had rejected the United States' offer."   (*Id.*)

On cross-examination, counsel was asked to confirm that, in the Memphis case, Petitioner "was sentenced at a range that's not reflecting of his career offender status[.]"   (*Id.* at PageID 244.)   Counsel stated "Correct.  I believe that's true.  Yes."   (*Id.*)   Alden was asked to "move[] forward to the time that [Petitioner was] given an offer" in the Jackson case.   (*Id.*)   Counsel confirmed that the offer did "not reflect the range of [Petitioner's] career offender status."   (*Id.*)   When asked whether it was "fair to say" that, at the "point when [Napper was] given offers for two sentences,"

---

[5]  The parties' references to "Mason" are to the West Tennessee Detention facility, which is located in Mason, Tennessee.

he was "not dealing with his career offender status[.]"  (*Id.* at PageID 245.)  Counsel replied as follows:

> A.      Well, it's hard for me to get in Mr. Napper's mind. But as I explained it to him, he would be a career offender. But because we were raising some issues that had some legitimate basis regarding delaying the indictment, and some other things, that the government, in order to resolve the case short of a trial, an appeal, post conviction, that they were willing to reduce that and come to an agreement with him. And that's why the offer was made. But I did discuss with him why it was such a good deal, because he was a career offender.
> Q.      Okay. And you indicated he rejected that 72 month offer.
> A.      Correct.

(*Id.*)

On direct examination, Napper testified that counsel did not "advise [him] of [his] career offender status."  (*Id.* at PageID 251.)  He was asked "Did Mr. Alden review the discovery material with you, Mr. Napper?"  (Id. at PageID 253.)  He replied "No, sir.  My PSR report.  The only thing him and the PSR reporter said was, we going to update the PSR.  You know, I didn't receive a copy of it or nothing.  I didn't receive nothing."  (*Id.* at PageID 253-54.)  When asked again about discovery, Petitioner insisted that counsel "didn't explain nothing."  (*Id.* at PageID 253.)

Napper confirmed that he "had met with [counsel] about the plea offer at Mason," but that "by the time" of that meeting counsel had not "reviewed all the discovery" with him.  (*Id.* at PageID 254.)  He was asked, "Now in that negotiation about your plea offer at Mason, did [counsel] discuss with you at all about your career history, criminal history?"  (*Id.*)  Petitioner replied that counsel

> . . . just kept on telling me to take the plea.  I told I just can't keep on taking pleas.  I had just signed for some time. . . . On top of that, my daughter mother had died.  So I just couldn't keep on signing on to something.  And he ain't showing me no evidence, nothing.  He just verbal, verbal.  I couldn't go off that.

(*Id.* at PageID 254-55.)

Regarding the Memphis case, Petitioner testified as follows:

Q.  Okay.  What was the amount of time that you signed to serve?

A.  Thirty-six months.

Q.  Was that, in fact, ordered for you to serve?

A.  Yeah, 36 months.

Q.  Was that by agreement?

A.  That was, yes, just agreement.

Q.  Okay.  And did you gain an understanding of that agreement before you were sentenced?

A.  Yes, sir.

Q.  Okay.  And did you go into sentencing knowing that that was likely to be the agreement if it was ordered?

A.  Yes, sir.

Q.  Okay.  So were you focused on anything other than that agreement at that time?

A.  No.

(*Id.* at PageID 255.)

Napper was asked to "fast forward[] to [the] point in time [when he was] given" the plea offer in the Jackson case:

Q.  Okay.  And Mr. Alden is giving you this agreement?

A.  Yes, sir.

Q.  But you d[idn't] agree with it?

A.  Only reason I didn't is because I never seen the evidence.

Q.  You wanted to see evidence—

A.  Yeah.  Because [counsel] telling me [he] got the tapes every time [he] came, but [he] never produced them.  [He] saying [he] ain't got enough time.  But [he] had enough time to come down [there] to visit me.  That's what I didn't understand.

(*Id.* at PageID 255-56.)

Petitioner was shown counsel's October 25, 2013 letter, which was addressed to him at Mason.  (*Id.* at PageID 256)  He testified that he did not receive the letter because he was housed "in Jackson" at the time.  (*Id.*)  He was asked, "Now you're telling the Court, you didn't know your career offender status?"  (*Id.* at PageID 257.)  He answered, "Right, because in my first [case]

it wasn't never mentioned."  (*Id.*)  He later reiterated that his career offender status "wasn't

mentioned" in the Memphis case.  (*Id.* at PageID 259.)

Napper was asked "Why did you change your plea" in the Jackson case?  (*Id.* at PageID

257.)  He responded,

> . . . I wasn't trying to fight the charge, just trying to get him to show me, let me
> hear the evidence.  You know what I'm saying.  I wouldn't have took the 72
> months.  Ain't no way I would have went in with an open plea and got more
> time . . . than 72 months.  Ain't no way possible I would have done that.

(*Id.*)

He was further asked, "Now when you pled guilty in the open plea [in the Jackson case],

did you know of your career offender status?"  (*Id.*at PageID 258.)  He answered, "It never was

mentioned."  (*Id.*)  He testified that he did not "make an acknowledg[ment]" of his career offender

status in "open court" at the time of his plea because his status was "never was mentioned period."

(*Id.*)  He stated that he was "advised of his career offender status" "[o]nly by the Judge when he

said it. . . . [a]t sentencing."  (*Id.* at PageID 259.)  He answered "Yes," when asked, "That's when

you first learned of it?"  (*Id.*)

Petitioner elaborated on the conversation he had with Alden about the plea offer:

> Q.  Okay.  Mr. Napper, did you discuss with [counsel] a potential sentencing range
> you were looking at being exposed to?
> A.  No.  The only time when he came it was just, take the time.  That's it . . . . He
> was just telling me to take the time.  I ain't really go over nothing with him.
> Q.  Okay.  Had you known of your career offender status, would circumstances be
> different?
> A.  Yes.
> Q.  How so?
> A.  Because it just make all the sense in the world.  Why would I want a longer
> sentence when I can possibly get a lesser time?  It just don't make sense.
> Q.  Okay.  So did you know the deal you were looking at?
> A.  I knew about the 72 months.  But that's what—without the evidence.  All he
> had to do was let me hear the tapes.

13

> Q.  Okay.  Do you feel that, perhaps, Mr. Napper, that you suffered a degree of prejudice from, from that disparity in sentencing?
> A.  Yes, sir.
> Q.  Okay.  And that your liberty has been constrained or confined for a much longer time?
> A.  Yes, sir.
> Q.  Are you holding Mr. Alden to a degree of responsibility for that?
> A.  Yes, sir.

(*Id.* at PageID 260-61.)  Petitioner confirmed that his "sentence [would have] expired had [he] agreed to th[e] original plea offer." (*Id.* at PageID 257.)

On cross-examination, Napper was shown portions of the transcript from the sentencing hearing in the Memphis case.  He replied "No" when he was asked, "Do you recall them talking about, in that sentencing, the term, career offender?" (*Id.* at PageID 264.)  He was also directed to look at the following exchange:

> COURT: Now, Mr. Napper, get it together.  You've got an opportunity here that you wouldn't have in most situations.  Ordinarily I -- first, I respect the guidelines a lot.  Not everybody does, but I do.  Your guideline range is up to 188 months in prison.  Your statute range is up to 20 years in prison.  You're getting a three-year prison sentence.  I consider that a very serious sentence.  If you have to serve it, I'm sure you consider it a very serious sentence.  But it's a lot less than you could have gotten in this case.
>
> THE DEFENDANT : Yes, sir.

(*Id.* at PageID 266-67 (identifying Ex. 4 at 39).)[6]  When asked, Napper stated that he did not recall Judge Mays making those statements or himself stating "Yes, sir" in response to them.  (*Id.* at PageID 267.)  He acknowledged that, "if you got it in writing, he had to say it, if these the transcripts." (*Id.* at PageID 267-68.)  Petitioner also did not recall that Judge Mays quoted the

---

[6] Upon the Court's request for clarification, the Government's attorney specified that page 40 of the original docket entry stamped at the top of the transcript corresponded to page 39 of the transcript.  (D.E. 67 at PageID 266.)

portion of his position paper which stated, "Mr. Napper recognizes and acknowledges he qualifies as a career offender under the guidelines." (*Id.* (quoting Ex. 4 at 9).)

Petitioner testified that taking an open plea "was [his] only option . . . left [b]ecause it took them so long to let [him] hear the tapes[.]" (*Id.* at PageID 272.) He also stated, "if [counsel] would had advise, gave my right of advisement, we wouldn't be here today. That's why I'm here." (*Id.*) He was asked, "[I]s it your testimony that you would have taken [the plea] offer?" (*Id.*) The following discussion ensued:

> A. Yeah, I would have took it, if I would have had the evidence. Like I just told you, my daughter mother had just died. And I -- like told him, I just can't keep signing for time. All he had to do was let me hear the tapes, we wouldn't be here today.
> Q. What tapes are you talking about?
> A. The tapes that -- what he said that I was recorded on from my actual case. I never heard them until the day of my sentencing. Wasn't no plea on the table then.
> Q. So you just decided to plead guilty without any understanding of what the government had against you. Is that your testimony?
> A. No. I pled guilty—he let me hear my tapes the day of sentencing. I wasn't planning—my plans wasn't never to go to trial. I already knew about the witnesses. I just wanted to hear, to verify what I already knew. And he kept telling me was going to let me hear the tapes, and never did, not one time, until the day of my sentencing. After that, the plea was already gone.

(*Id.* at 272-73.)

Alden was recalled to the stand. He confirmed that, "as reflected in . . . the October 25th, 2013, letter, [he] had . . . discussed numerous times all the issues, including the evidence, as well as this 72 month offer to Mr. Napper[.]" (*Id.* at PageID 276.) He was asked, "And was Mr. Napper adamant in his rejection of that offer?" (*Id.*) He answered, "He was." (*Id.*)

ANALYSIS

To succeed on an ineffective-assistance claim, a petitioner must demonstrate two elements: (1) "that counsel's performance was deficient"; and (2) "that the deficient performance prejudiced

the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The Sixth Amendment right to effective counsel extends to the plea-bargaining process and is governed by the two-prong *Strickland* test." *United States v. Laird*, 591 F. App'x 332, 337–38 (6th Cir. 2014) (citing *Lafler v. Cooper*, 566 U.S. 156, 162 (2012) and *Hill v. Lockhart,* 474 U.S. 52, 57 (1985)). To demonstrate that counsel was ineffective at the plea-bargaining stage, a petitioner must show that counsel's conduct was deficient and "that the outcome of the plea process would have been different with competent advice." *Id.* (citing *Lafler,* 566 U.S. at 163).  !

An attorney who gives "materially inaccurate sentencing information or advice to [a] defendant" during plea negotiations performs deficiently. *Id.* at 338 (citing *Hill*, 474 U.S. at 57 (1985) (counsel's failure to accurately inform the defendant of the amount of time he would have to spend in prison before he became eligible for parole constituted deficient performance)). "[A] large sentencing disparity between a plea offer and the sentence received after trial establishes a . . . presumption of prejudice[.]" *Johnson v. Genovese*, 924 F.3d 929, 940 (6th Cir. 2019) (citing *Sawaf v. United States*, 570 F. App'x 544, 548 (6th Cir. 2014)).

Napper has not met his burden of establishing that counsel performed deficiently. The Court credits counsel's testimony that he advised Petitioner about his career-offender status prior to his rejection of the offer. At the time he represented Napper in 2013, counsel was an experienced Assistant Federal Public Defender who had appeared many times before the Court. The undersigned has observed in many proceedings, including in the Jackson case and at the Evidentiary Hearing, counsel's demeanor and professional conduct. Counsel testified that he explained to Petitioner "on numerous" occasions his career offender status, including telling him at the time the plea offer was made "why it was such a good deal, because he was a career offender." (D.E. 67 at PageID 245.) His client nevertheless rejected the offer. (*Id.*)

As mentioned, Napper testified to the contrary, stating that the only advice counsel gave him when they met after the offer was made was to "[j]ust take the time." (*Id.* at PageID 260.) take the plea." (Id. at PageID 31.) The Court finds that inconsistencies between significant portions of Petitioner's testimony and the records in his two criminal cases, including his prior in-court statements in those cases, undermine his credibility as a whole.

For instance, Petitioner testified at the Evidentiary Hearing that the *first time* anyone told him he was a career offender was when the undersigned so informed him at sentencing in the Jackson case. He also testified that counsel did not review the presentence report from that case with him. Both of these assertions are, however, contradicted by his representations to the Court in the Jackson case. Specifically, Petitioner affirmed at the sentencing hearing that he had reviewed with counsel a copy of the 2013 PSR—a document that advised that Petitioner was subject to an enhanced sentence as a career offender.

Similarly, Petitioner's testimony at the Evidentiary Hearing that counsel's failure to review discovery with him in the Jackson case left him with no "option" but to make an open plea is belied by the record in that case. At the change of plea hearing, he confirmed that he was "satisfied with [counsel's] advise and representation." (No. 1:13-cr-10008-JDB-1, D.E. 176 at PageID 496.) !

Finally, as discussed above, Napper testified at the Evidentiary Hearing that he did not know of his career offender status in the Jackson case because, in part, it was never "mentioned" in the Memphis case. That proffered reason for Petitioner's purported ignorance in the Memphis case is implausible, and therefore calls his into question his credibility as whole. More to the point, the 2009 PSR advised that he was a career offender and Petitioner's position paper agreed with that assessment. At his sentencing hearing, he personally confirmed to Judge Mays that he had reviewed the PSR and discussed it with his attorney. Additionally, Petitioner was present for the

entirety of the sentencing hearing, at which the judge and the attorneys discussed at length his status as a career offender. Judge Mays stated several times that Napper was a career offender, and he found that Napper was therefore subject to a Guidelines range of 151 to 188 months. Following all of that, the judge spoke directly to Petitioner about the fact that the 3-year sentence was substantially less than the 188 months he could have received. Petitioner responded "Yes, sir."

Having observed Petitioner's demeanor at both the Evidentiary Hearing and in proceedings in the Jackson case, and having considered the above-outlined inconsistencies, the undersigned does not find Petitioner to be a credible witness. His testimony that counsel did not advise him of his career offender status and its potential consequences before he declined the Government's plea offer is rejected. Crediting Alden's contrary testimony, the Court finds that he properly advised Petitioner during the plea negotiations. Counsel, thus, did not perform deficiently. Because Napper has failed to satisfy the first prong of *Strickland*'s test, his claim is subject to denial on this ground alone. *See Strickland*, 466 U.S. at 697.

Regarding prejudice, it is undisputed that there is a large disparity between the sentence imposed and the plea offer. Therefore, had counsel not provided adequate advice, Napper would be entitled to a presumption that there is a reasonable probability he would have accepted the offer had counsel properly advised him. *See Sawaf*, 570 F. App'x at 547. Assuming, arguendo, that counsel's performance was deficient, the Court finds that the presumption has been rebutted.

First, Napper's testimony about why he rejected the plea offer is, at best, equivocal. *See Johnson*, 924 F.3d at 940 (presumption of prejudice was rebutted, in part, by "petitioner's equivocal testimony" as to whether he would have accepted the plea offer) *see also Sawaf*, 570 F. App'x at 549 (petitioner's "testimony at the evidentiary hearing was unequivocal in stating that he

would have pleaded guilty if he had been adequately informed of the risks involved with proceeding to trial"). Petitioner did not expressly testify that he would have accepted the plea offer had counsel advised him of his career offender status. The closest he comes is his statement that "we wouldn't be here today" had counsel "gave [the] right advisement." (D.E. 67 at PageID 272.) In contrast, he insisted several times that the reason he did not accept the Government's offer was counsel's alleged failure to review the evidence with him.[7] (*See id.* at PageID 272 ("I would have took it if I would have had the evidence."), 260 ("So did you know the deal you were looking at? . . . I knew the 72 month. But that's what—without the evidence. All he had to do was let me hear the tapes."). In fact, at one point Napper testified that counsel's alleged failure to provide him with the discovery materials was the "only" reason he spurned the offer. (*Id.* at PageID 256.)

Second, as indicated earlier, the record from the Memphis case shows that that Petitioner knew of his career offender status prior to commencement of the Jackson case. At the sentencing hearing before Judge Mays, Napper's career offender status was mentioned and discussed multiple times. Additionally, Judge Mays spoke directly to the Defendant about the fact that his 3-year sentence was well below the 188 months he could have gotten. Most importantly, perhaps, Petitioner personally affirmed to the judge that he had reviewed the presentence report with his attorney—a document that expressly stated that he was a career offender subject to an enhanced sentence. Therefore, the record in the Memphis case shows that Petitioner knew of his career offender status and its potential sentencing consequences as early as August 2012. He therefore knew as much during the proceedings in his Jackson case, but he nevertheless rejected the offer. Counsel's testimony that Napper did not seem surprised when he told him he was a career offender

---

[7] Petitioner's allegations that counsel did not review the discovery materials with him and that this caused him to forego the plea offer are new assertions; he did not present them in the Amended Petition (D.E. 1, 10) or the Supplemental Brief (D.E. 42).

is consistent with the conclusion that Petitioner was aware of his status going into the Jackson case.

For these reasons, the Court holds that counsel did not provide ineffective assistance at the plea stage.  The sole remaining claim and the Amended Petition are DENIED.

## APPEAL ISSUES

A § 2255 petitioner may not proceed on appeal unless a district or circuit judge issues a certificate of appealability ("COA").  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).  A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2)-(3).  A substantial showing is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel,* 529 U.S. 473, 484 (2000)).  "If the petition was denied on procedural grounds, the petitioner must show, 'at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'"  *Dufresne v. Palmer*, 876 F.3d 248, 252-53 (6th Cir. 2017) (per curiam) (quoting *Slack*, 529 U.S. at 484).

In this case, reasonable jurists would not debate the correctness of the Court's decision to deny the Amended Petition.  Because any appeal by Petitioner does not deserve attention, the Court DENIES a certificate of appealability.

Pursuant to Federal Rule of Appellate Procedure 24(a), a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit.  Fed. R. App. P. 24(a).  However, Rule 24(a) also provides that if the district court certifies that an appeal would

not be taken in good faith, the prisoner must file his motion to proceed in forma pauperis in the appellate court. *Id.*

In this case, for the same reason it denies a COA, the Court CERTIFIES, pursuant to Rule 24(a), that any appeal in this matter would not be taken in good faith. Leave to appeal in forma pauperis is therefore DENIED.[8]

IT IS SO ORDERED this 14th day of October 2021.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

---

[8] If Petitioner files a notice of appeal, he must also pay the full $505.00 appellate filing fee or file a motion to proceed in forma pauperis and supporting affidavit in the Sixth Circuit Court of Appeals within thirty days.